| | |
|---|---|
| **DONNA N. PARKER** | **CIVIL ACTION NO. 5:17-CV-01453** |
| **VERSUS** | **JUDGE TERRY A. DOUGHTY** |
| **BENTELER STEEL, ET AL.** | **MAG. JUDGE KAREN L. HAYES** |

**RULING**

Plaintiff Donna N. Parker ("Parker") sued her former employer, Benteler Steel/Tube Manufacturing Corp. ("Benteler") alleging claims of sexual harassment, failure to accommodate, and retaliation.  Pending before the Court is Benteler's Motion for Summary Judgment [Doc. No. 49] seeking dismissal of Parker's claims.  Parker has filed an Opposition [Doc. Nos. 61, 67]. Benteler has filed a Reply [Doc. No. 63].

For the following reasons, the Motion for Summary Judgment is **GRANTED.**

## I.    FACTS

Benteler specializes in manufacturing and processing seamless hot-rolled steel tubes and seamless cold-drain steel tubes for automotive, precision engineering, construction, and energy production/exploratory drilling industries. Parker was hired by Benteler in June of 2015 as a bar saw operator in its Shreveport, Louisiana facility.  [Doc. No. 49-4, p. 1]

A bar saw operator works in the billet cutting area.  A "billet" is a long, rectangular length of semi-finished metal that can be folded or rolled into a finished product such as pipe or steel bars.  The saw line cuts the billets according to the length and weight requirements for a particular production job.  The bar saw operator is responsible for starting the automated cutting process and supervises and controls the process. [Doc. No. 49-3, pp. 7-8, 42-45].

The bar saw that Parker was required to operate has a circular blade approximately 27.5 inches in diameter and weighs 33.5 pounds. Her job also required that she operate a forklift and an overhead crane, which are used to move the steel billets and replace the saw blade. The overhead crane is on a track near the top of Benteler's facility approximately 36 feet above the plant floor. The crane is capable of moving up to 33,000 pounds. Parker's job required that she regularly use the crane to move solid steel bars and billets, which can range from 4.3 feet to 50 feet long and weigh between 435 pounds and 5,105 pounds. [Doc. No. 49-4, p. 1; Doc. No. 49-6]

Parker was supervised by Troy Lambright ("Lambright"). Lambright in turn reported to Darryl Guy ("Guy"), Benteler's Area Manager for Hot Mill Operations. [Doc. No. 49-4, p.1]

As a newly-hired employee, Parker was placed on a 90-day probationary status while she learned and trained in her job. Bentler assigned an experienced operator, Gregg Black ("Black"), to train Parker. By August of 2015, Benteler became concerned that Parker was unable to perform simple tasks associated with her job, such as starting the saw. Parker blamed her trainer, Black, for her deficiencies and requested a new trainer. [*Id.*]

Benetler granted her request and assigned Nick Smiley ("Smiley") to be her new trainer. Soon thereafter Smiley reported that Parker's attitude was extremely poor, she lacked direction, and she was not qualified for her position. [*Id*. p. 2].

Parker voiced an interest in moving to a different position in the facility, rather than continue to train in the bar saw operator position for which she was hired. She asked Lambright to sign a referral form to bid into a new position. However, she was informed that she could apply for other positions but was reminded that she was still in her 90-day probationary period and an employee cannot transfer to a new job during that period. She was also cautioned that her

lack of progress in her current training may not reflect well in her pursuit of another position. [*Id.*]

On September 15, 2015, Parker was issued an Employee Discipline Report outlining her poor performance and her probationary period was extended by four weeks. Other new employees who had been in the position for less time than Parker were already operating the bar saws without supervision, and in some cases, were providing instruction to Parker. [*Id.*; Doc. No. 49-7].

On or around September 21, 2015, Bentler conducted a 90-day evaluation of Parker's work performance, and she received the lowest possible score in almost every category, including Initiative, Work Standards, Job Knowledge, and Teamwork/Cooperation. [Doc. No. 49-8].

On or around September 25, 2015, Rhonda Simmons ("Simmons"), Benteler's Human Resources Director, met with Parker regarding her performance evaluation, and told her that Benteler's primary concern was her work performance. Simmons requested that she focus on learning her job. Parker placed the blame on a lack of training and requested yet another trainer. Simmons instructed Parker to address her request to Benteler's Director of Operations, but Parker never did. [Doc. No. 49-4, p.2].

On October 26, 2015, Parker filed a charge with the EEOC alleging discrimination based on race, sex, and retaliation (Charge No. 846-2015-40693) [Doc. No. 1-2, p. 12]. She alleged she was receiving poor performance evaluations and was denied a requested transfer to a different position because of her sex and race. [*Id.*]

On or around November 5, 2015, when asked to move a forklift because it was hindering the work of her co-workers, Parker argued with her supervisor and said he was being "sexist"

due to the direction he gave to her. She ultimately moved the forklift but continued to sit, without engaging in any work activity. [*Id.*]

On or around November 9, 2015, Parker was scheduled to "shadow" a crane operator as part of her training, but a supervisor found her sitting outside of her work area. Parker stated that she did not need to train on the crane, did not have to do anything she was not comfortable doing, and she was not going to be in her current job much longer. The assignment was reiterated to Parker, but she continued to argue with her supervisor. [*Id.*]

On or around November 11, 2015, Parker refused to assist a supervisor in troubleshooting a problem in the production process. Parker was argumentative and claimed that one of her co-workers asked her to perform a different task. [*Id.*, p.3]

On November 23, 2015, Parker was issued a second Employee Discipline Report as a result of her behavior. [Id.; Doc. No. 49-9]. Also on November 23, 2015, another employee reported that Parker looked at messages on his personal cell phone without his permission, and that he found working with Parker to be difficult. [Doc. No. 49-4, p.3]. Parker was issued a third Employee Discipline Report as a result of this incident on December 7, 2015. [Doc. No. 49-10].

On or around November 9, 2015, Parker's doctor wrote to Benteler about medication that Parker was taking. The doctor explained that Parker's medication may cause dizziness and frequent urination and stated she would appreciate any work considerations due to Parker's medication. The doctor did not state what those considerations should be. [Doc. No. 49-4, p.3].

Parker was absent from work in early December of 2015. She returned to work and provided a doctor's excuse stating she could perform her job with no restrictions. [Id.; Doc. No. 49-12]. However, on December 15, 2015, Parker refused to operate the bar saw by herself and

stated she could not run the overhead crane because she was on medication that caused dizziness. [Doc. No. 49-4, p. 3; Doc. No. 49-3, p. 21-22]

Operating the bar saw and crane are essential functions of the bar saw operator job. Operating the equipment while experiencing dizziness could have jeopardized Parker's safety, the safety of her co-workers, and Benteler's equipment.  [Doc. No. 49-4, p.3].  Following a meeting with Benteler's human resources department, Parker was placed on a leave of absence. To appropriately evaluate what job duties Parker could safely and effectively perform, Simmons instructed Parker to obtain information from her doctor regarding whether she could safely perform the essential functions of the bar saw operator job and whether any limitation or accommodation was needed. [*Id.*]

To facilitate its request that Parker obtain information from her doctor, Simmons provided Parker with a copy of her job description and a list of questions to be answered. [Id.; Doc. No. 49-13].  On January 19, 2016, Parker's doctor issued a letter stating that Parker could perform the essential functions of her job "with reasonable accommodation." [Id.; Doc. No. 49-3, p. 46].  However, the only accommodation identified was "easy access to a restroom," which Benteler was already providing to Parker in response to an almost identical letter provided by Parkers physician on November 9, 2015. [Doc. No. 49-4, p. 3]

Although not stated in the January 19, 2016 letter, Parker testified during her deposition that her doctor specifically concluded that Parker could not operate the overhead crane used to move the steel billets and replace the saw blade. Her testimony on this point was as follows:

> Q.   Yes. And Dr. Kamphuis issued a letter dated January 19, 2016, that's what's been marked as Exhibit 9; is that correct?
>
> A.   Yes.

Q.      Okay. And she mentioned in the January 19th letter that you needed to have access to the restroom because the medicine made you use the bathroom?

A.      Correct.

Q.      Okay. But with respect to the medication and some of the job duties that were included in the memo that you took her, am I correct that she confirmed that the medicine was still going to present a risk of you getting dizzy and, therefore, you shouldn't be doing some of those things?

A.      Operating a crane I was going to be dizzy, not the saw.

Q.      So Dr. Kamphuis specifically concluded that you could operate the saw, but that you could not operate the crane?

A.      Right....

[Doc. No. 49-3, p. 27]

Since the letter provided by Parker's doctor failed to address her reports of "dizziness" or her statements that she could not perform her job, Simmons gave Parker the option of obtaining additional information from her doctor or completing a fitness-for-duty evaluation. Because Parker said her doctor would not provide the requested information, Benteler's human resources department worked with her to schedule the fitness-for-duty evaluation. [Doc. No. 49-4, p.4; Doc. No. 49-3, p. 29]

The physician who conducted the evaluation reported that Parker refused to cooperate; refused to discuss her medical history, her medications, or their side effects, and stated she did not come to be questioned; and she refused to be examined. The physician could therefore not complete the evaluation. [Doc. No. 49-4, p. 4; Doc. No. 49-14]. The physician eventually issued a formal report that no determination could be made regarding Parkers fitness-for-duty because of her behavior. [Doc. No. 49-4, p. 4; Doc. No. 49-15].

On February 15, 2016, after the unsuccessful fitness-for-duty evaluation, Benteler issued a letter directly to Parker's doctor. It again sought confirmation that Parker could safely perform

the essential functions of the bar saw operator job and whether any limitation or accommodation was needed. [Doc. No. 49-4, p. 4; Doc. No. 49-16] A copy of Parkers job description, photographs of the relevant equipment, and a copy of the report from the failed fitness-for-duty exam were attached to the letter. [*Id*.] Benteler also invited Parker's doctor to visit its facility, if necessary. Parker's doctor did not respond to the letter. [*Id*.]

On March 16, 2016, Parker filed a second charge with the EEOC (Charge No. 461-2016-00611) [Doc. No. 1-2, p. 8], alleging that she was denied a reasonable accommodation and retaliated against when Benteler requested more information regarding her alleged disability.

On March 23, 2016, Benteler issued a letter directly to Parker in a final attempt to confirm her fitness-for duty. [Doc. No. 49-4, p.4; Doc. NO. 49-17] Parker conceded during her deposition that following her receipt of the letter: (1) she did not visit her doctor or any other doctor to obtain the requested information; (2) she did not follow up with Benteler's human resources department; (3) neither she nor any doctor on her behalf sent any questions or requests for information to Benteler; and (4) she had no further contact with anyone from Benteler. [Doc. No. 49-3, p. 36, 37].

Parker never responded to Benteler's March 23, 2016 letter. [*Id*.] As such, Benteler contends it was never able to obtain the information necessary to evaluate Parker's ability to safely perform the essential functions of her job (or any other job). On April 22, 2016, Benteler issued a letter to Parker terminating her employment. [Doc. No. 49-18].

On July 14, 2016, Parker filed a third charge with the EEOC (Charge No. 461-2016-01108) (Doc. No. 1-2, p.3], alleging that her termination was retaliation in response to her first two charges of discrimination.

On August 8, 2017, the EEOC dismissed all three of Plaintiff's charges, concluding that "[b]ased on its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statute." [Doc. No. 1-2, pp. 5, 9,14].

On November 6, 2017, Parker filed this lawsuit. In her initial Complaint, she alleges that that she was denied a reasonable accommodation and retaliated against "after [she] filed with the EEOC." [Doc. No. 1, p. 3]. Her initial Complaint also includes the allegation that her trainers "was liking [her]" and "always say [sic] sexual things to me." [*Id*.] Following the dismissal of several individual defendants named in her initial Complaint, Parker filed an Amended Complaint attempting to provide more details regarding her claims of sexual harassment, failure to accommodate, and retaliation. Plaintiff confirmed during her deposition that these are the only three claims that she is pursing through her lawsuit. [Doc. No. 49-3, p. 4, 5].

Benteler argues in its motion for summary judgment that Parker failed to satisfy the mandatory pre-suit prerequisites applicable to her sexual harassment claim; that her failure to accommodate claim should be dismissed because she was not qualified to perform her job, Benteler provided the only accommodation she requested, and she refused to cooperate in the interactive process; and that her retaliation claim should be dismissed because her poor performance evaluations were not adverse employment actions and she was terminated for legitimate, non-retaliatory reasons.

The motion is fully briefed, and the Court is prepared to rule.

## II.    LAW AND ANALYSIS

### A.    Standard of Review

Under Federal Rule of Civil Procedure 56(a), "[a] party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary

judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the initial burden of informing the court of the basis for its motion by identifying portions of the record which highlight the absence of genuine issues of material fact. *Topalian v. Ehrmann*, 954 F.2d 1125, 1132 (5th Cir. 1992); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be . . . disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.*

If the moving party can meet the initial burden, the burden then shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial. *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir. 1994). In evaluating the evidence tendered by the parties, the Court must accept the evidence of the nonmovant as credible and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255. However, "a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (citing *Anderson*, 477 U.S. at 248.)

   **B.     Sexual Harassment Claim**

Benteler contends that Parker failed to satisfy the mandatory pre-suit prerequisites applicable to sexual harassment claims because she made no allegation of sexual harassment in her EEOC charges of discrimination. Therefore, her sexual harassment claim should be dismissed

with prejudice.

Before a plaintiff can bring an action in federal court under Title VII (42 U.S.C. §2000e), he or she must first exhaust available administrative remedies. *Ellzey v.Catholic Charities Archdiocese of New Orleans*, 833 F.Supp.2d 595, 599 (E.D. La. 2011). "Title VII's exhaustion requirement is satisfied only if a plaintiff files a timely charge with the EEOC and receives a statutory right-to-sue notice." *Id*. The "failure to comply with this requirement will result in dismissal of a plaintiff's claim." *Id*. Any suit filed may encompass only those allegations included in a Charge of Discrimination or developed "in the course of a reasonable ... investigation of that charge." *Weathers v. Marshalls of MA, Inc*., No. 02-717, 2002 WL 1770927, *2 (E.D. La. 7/31/02) citing *National Ass 'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio,* 40 F.3d 698, 711 (5th Cir. 1994).

Parker's first Charge of Discrimination made a complaint of sex discrimination but did not allege sexual harassment or mention sexual harassment. She checked the box for "sex" discrimination. Her second charge alleged she was denied a reasonable accommodation and her third charge focused on her retaliation claim. She did not check the box for "sex" discrimination and did not mention sexual harassment in her second or third charge.

In her deposition, she acknowledged that she did not provide any information, or inform the EEOC, about the sexual harassment claims she has now made in her lawsuit:

> Q.    But if I understand your testimony correctly, you never told the EEOC about the sexual harassment claims?
>
> A.    Not in the paperwork, but she actually didn't do a full, to me, investigation because she never questioned me about nothing. She just asked the doctor questions.
>
> Q.    So, yes or no, did you give the EEOC any information about your sexual harassment claims?
>
> A.    No. I just told human resources.

Q.      At Benteler Steel?

A.      Yes.

Q.      Okay.

[Doc. No. 49-3, p. 38-39]

However, in her opposition, Parker contends that she gave a hand-written note to the EEOC

informing them of facts sufficient to establish a sexual harassment claim. The note reads as

follows:

> I was denied to be transferred after I had went to Rhonda Simmons
> explaining to her that I was being harassed by my supervisors and
> the guys that they had to train me wasn't training me well. One guy
> had liked me, so he will get upset and not train me if other guys was
> talking to me and I asked and asked to be move, but instead they
> kept me in that position and tried Nick Simley and it didn't go well.
> Troy Lambright and him was close so he had him doing things so I
> couldn't learn. I even ran the saws by myself which everybody in
> the plant will verify, because they all knew what they was doing to
> me. They moved a few people that was still in the 90 day probation
> period and my witness can verify that.

[Doc. No. 61-1, p. 1]

Benteler responds that Parker has not authenticated that note to make it admissible in

evidence, and even if it is considered, it is not sufficient to create a genuine issue of material

fact.

Benteler further argues that Parker's complaint in her first Charge of Discrimination

(Charge No. 846-2015-40693) was that she was receiving less favorable treatment because

of her gender - it was not a complaint of sexual harassment; that the terms "sexual

harassment" or "sexually harassed" were not included in her charge; that the handwritten

page on which Parker now seeks to rely is consistent with these facts; that the specific

complaint set forth in the handwritten note is that the "guys that they had to train me weren't

training me well;" and that, in support of this complaint, she claimed that "one guy had liked me so he will [sic] get upset and not train me if other guys was [sic] talking to me." [*Id.*]. Benteler contends that this is not an allegation, much less evidence, of sexual harassment. Rather, it is merely an allegation that, in her mind, she was not receiving appropriate training.

Benteler further shows that Parker was given the opportunity to write on all of her Employee Discipline Reports any reasons why she might disagree with the discipline imposed, yet she never made any mention of sexual harassment. Additionally, in her deposition, Parker testified that she recorded virtually every meeting she had with anyone at Benteler on her cell phone, yet she admitted that she has no recordings of any instances of sexual harassment.

The Court finds that, assuming arguendo that the note is admissible in evidence, that it is nevertheless insufficient to show that Parker made a sexual harassment claim to the EEOC or that such a claim could have grown out of her charge of discrimination, particularly in light of her deposition testimony that she did not give the EEOC any information about a claim of sexual harassment.

Accordingly, Benteler must be granted summary judgment in its favor dismissing with prejudice Parker's claim of sexual harassment. Parker failed to satisfy the mandatory pre-suit prerequisites applicable to sexual harassment claims because she made no allegation of sexual harassment in her EEOC Charges of Discrimination.

### C.    Failure to Accommodate Claim

Parker contends that her doctor sent accommodation notices to Benteler informing it that she was on a medication that caused her to experience dizziness and to require frequent trips to the restroom, but that Benteler failed to make reasonable accommodations for her limitations.

Benteler responds that Parker's failure to accommodate claim should be dismissed because

Parker was not qualified to perform her job, Benteler provided the only accommodation requested by Parker, and Parker refused to cooperate in the Interactive Process.

The ADA Amendments Act of 2008 ("ADAAA") prohibits employers "from discriminating against a qualified individual with a disability on the basis of that disability." *Burton v. Freescale Semiconductor, Inc.* 798 F.3d 222, 226-27 (5th Cir. 2015) (internal quotation marks omitted) (quoting *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014)).

In order to state a failure to accommodate claim, Parker must show: "(1) [she] is a 'qualified individual with a disability;' (2) the disability and its consequential limitations were 'known' by the covered employer; and (3) the employer failed to make 'reasonable accommodations' for such known limitations." *Feist v. La., Dep't of Justice, Office of the Att'y Gen.*, 730 F.3d 450, 452 (5th Cir. 2013). "An employee who needs an accommodation ... has the responsibility of informing her employer." *Delaval v. PTech Drilling Tubulars, L.L.C.*, 824 F.3d 476, 481 (5th Cir. 2016) (citing *EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 621 (5th Cir. 2009)).

"Once an accommodation is requested, an employer must engage in the 'interactive process,' or a flexible dialogue, with the employee with the goal of finding an appropriate accommodation for the limitation." *Id.* An employer "that fails to engage in the interactive process in good faith violates the ADA." *Id.*, citing *Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 224 (5th Cir. 2011). If the breakdown in the interactive process is "traceable to the employee," there is no violation on the employer's part. *Id.* The employee bears the ultimate burden of demonstrating that the employer failed to implement a reasonable accommodation. *Riel v. Elec. Data Sys. Corp.*, 99 F.3d 678, 682 (5th Cir. 1996).

To survive Benteler's motion for summary judgment, Parker must prove that she is a "qualified" individual within the meaning of the ADA. *Credeur v. Louisiana Through Office of*

*Attorney General*, 860 F.3d 785, 792 (5ᵗʰ Cir. 2017). If she is not, the inquiry into her failure to accommodate claim "ends." *Id.* To be "qualified" under the ADA, Parker must establish that she was able to perform the essential functions of the bar saw operator position "with or without reasonable accommodation." *Id.*, citing 42 U.S.C. §12111(8). "Essential functions" are those that "fundamentally alter" the job if removed. *Id.* The primary factors to be considered in the "essential-function inquiry" include the employer's judgment as to which functions are essential and the written job description for the position. *Id.*, citing 29 C.F.R.§1630.2(n)(3); *Johnson v. C.H. Wilkinson Physician Network*, 1:17-0534, 2018 WL 3356881, *3 (W.D. La. 7/9/18). "The inquiry into essential functions is not intended to second guess an employer's business judgment with regard to production standards ... nor to require employers to lower such standards." *Id.*

### 1.      Parker was not qualified to perform her job

The written job description for Benteler's bar saw operator position includes the following description of responsibilities

> :... The bar saw operator accordingly undertakes all necessary steps to start the automated cutting processes. Furthermore, the bar saw operator supervises and controls the process and its several parameters.
>
> * * *
>
> The bar saw operator also has to undertake manual operations on the saws themselves. That includes all actions necessary to change a saw blade, as well as assuring the presence of new blades prior to the change. Additionally, fluids and greases will be refilled by the bar saw operator. To do so, the bar saw operator might need to operate a fork lift or an EOT crane by remote.... In order to assure a safe and efficient work place and process, the bar saw operator  has to perform housekeeping actions around saws, roller tables, sensors and other crucial equipment in the area.

[Doc. No. 49-3, pp. 42-43].

The job description also identifies "crane operations" as "required work experience."  [*Id.*]

As detailed above, the bar saw has a circular blade approximately 27.5 inches in diameter and weighs 33.5 pounds. The overhead crane used to move the steel billets and replace the saw blade is on a track near the top of Benteler's facility approximately 36 feet above the plant floor. A bar saw operator is required to regularly use the crane to move solid steel bars and billets, which can range from 4.3 feet to 50 feet long and weigh between 435 pounds and 5,105 pounds. [Doc. No. 49-4, p.1]. Operating the bar saw and the overhead crane are essential functions of the bar saw operator position. [Doc. No. 49-4, p.3]

Parker admits that in December of 2015, she reported that she could not operate the overhead crane because of "dizziness," which her doctor confirmed [Doc. No. 49-3, p. 27].

Federal courts have consistently held that an employee who is unable to operate the equipment needed to perform his or her job cannot be considered "qualified" under the ADA. *Hammond v. Jacobs Field Services*, 499 Fed. App'x. 377, 382 (5th Cir. 2012) (Summary judgment appropriate as employee could not perform "moderately heavy manual tasks" associated with operator position); *Galvan v. City of Bryan, Tex.*, 367 F.Supp.2d 1081, 1091 (S.D.Tex.2004) (Summary judgment appropriate as employee could not operate the heavy equipment needed to perform the job of "Equipment Operator"); *Ketcher v. Wal-Mart Stores, Inc.,* 122 F.Supp.2d 747, 752-53 (S.D.Tex. 2000) (Summary judgment appropriate as employee failed to contradict defendant's evidence that his "dizziness" rendered him unable to operate a forklift, lift heavy objects, and work at heights); *Foreman v. Babcock & Wilcox Co*., 117 F.3d 800, 808 (5thCir. 1997) (Judgment as a matter of law appropriate as employee could not carry materials into necessary work areas (which function only constituted 20%-30% of his responsibilities)).

Because Parker could not perform the essential functions of the bar saw operator position, she cannot be considered "qualified" for purposes of the ADA. This fact is fatal to her claim.

## 2. Benteler provided the only accommodation requested

Benteler contends that the only accommodation requested by or on behalf of Parker during her employment was "easy access to a restroom." The ADA's definition of a "reasonable accommodation" includes "making existing facilities used by employees readily accessible to and usable by individuals with disabilities." 42 U.S.C. §12111(9)(A).

Parker testified in her deposition that she was provided access to a restroom at all times during her employment [Doc. No. 49-3, p. 32]. There was a restroom approximately 362.2 feet from the workstation to which she was assigned [*Id.*, p. 31]. Parker acknowledged that Benteler never restricted her ability to use the restroom, and that if the restroom closest to her work assignment was occupied, there were other restrooms available [Id., p. 31-34].

Parker contends that she wanted to be transferred to a different area of Benteler's facility where she felt there was "more convenient" access to additional restrooms. However, the law is clear that "[t]he ADA provides a right to reasonable accommodation, not to the employee's preferred accommodation." *EEOC v. Agro Distribution, LLC*, 555 F.3d 462, 471 (5th Cir. 2009). ("The accommodation, however, does not have to be the 'best' accommodation possible, so long as it is sufficient to meet the job-related needs of the individual being accommodated.... [T]he employer providing the accommodation has the ultimate discretion to choose between effective accommodations and may choose the less expensive accommodation or the accommodation that is easier for it to provide." *Id.*, citing 29 C.F.R. pt. 1630, App., §1630.9.)

Providing a "reasonable accommodation" under the ADA does not require the employer to "relieve the employee of any essential functions of the job, modify the actual duties, or reassign existing employees or hire new employees to perform those duties." *Robertson v. Neuromedical Ctr.*, 161 F.3d 292, 295 (5th Cir. 1998).

When an employee claims a transfer should have been considered, "he or she bears the burden of proving that an available position exists that he was qualified for and could, with reasonable accommodations, perform." *Gordon v. Acosta Sales and Marketing, Inc*., No. 13-662, 2014 WL 7339117, *5 (W.D. Tex. 12/22/14). "A disabled employee has no right ... to choose what job to which he will be assigned." *Id*.

Parker has not carried her burden here. Although she asserts that Benteler should have found another position for her somewhere in the company, she presents no summary judgment evidence to show such a position was available, or, if one were available, she would have been qualified for it, despite her medical issues.

### 3.    Failure to cooperate in the "interactive process"

Benteler additionally argues that it is entitled to summary judgment because Parker refused to cooperate in the interactive process by failing to engage in a flexible dialogue with the goal of finding an appropriate accommodation for Parker's limitation. Benteler contends that having Parker operate the equipment while experiencing dizziness could have jeopardized her safety, the safety of her co-workers, and Benteler's equipment. Therefore, it was necessary for Benteler and Parker to engage in a "flexible dialogue" in order to determine whether Parker could safely and effectively perform the essential functions of her job or to determine what additional accommodations might be needed to facilitate Parker's continued employment. However, Parker refused to cooperate in that endeavor, according to Benteler.

Both the ADA and the applicable regulations authorize an employer to make a medical examination or inquiry that is job-related and consistent with business necessity. The employer may also make inquiries into the ability of an employee to perform job-related functions. 42 U.S.C. §12112(d)(4); 29 U.S.C.§1630.14(c). Such an inquiry is particularly appropriate in an industrial

setting such as Benteler's facility.  *Ketcher v. Wal-Mart Stores, Inc.*, 122 F.Supp.2d at 754

("Because Plaintiff, an operator of heavy machinery, had advised Defendant that he was suffering

from dizziness, Defendant quite properly exercised its right, as contemplated by rule 1630.14(c),

to request a physician's certification of what activities Plaintiff could and could not perform.").

 Toward this end, Benteler did the following:

> On December 15, 2015, Simmons prepared a copy of Parker's job description and a list of questions for Parker's doctor. [Doc. No. 49-13]

> On January 19, 2016, Parker's doctor responded that Parker could perform the essential functions of her job "with reasonable accommodation" but did not identify what accommodations might be needed other than "easy access to a restroom" (which Benteler was already providing). [Doc. No. 49-4, p. 3]

> After her doctor could not provide the requested information, Benteler gave Parker the option of obtaining additional information from her doctor or completing a fitness-for-duty evaluation. [Id., p. 4]

> Benteler's human resources department then worked with Parker to schedule the fitness-for-duty evaluation.  The physician who conducted the evaluation emailed Benteler's human resources department and reported that Parker refused to cooperate; refused to discuss her medical history, her medications, or their side effects; and refused to be examined.  Therefore, he could not complete the fitness-for-duty evaluation because of her behavior [Id.; Doc. No. 49-14]

> On February 15, 2016, after Parker refused to cooperate during the fitness-for-duty evaluation, Benteler issued correspondence directly to Parker's doctor requesting the necessary information. [Doc. No. 49-4, p. 4]

> On March 23, 2016, after Parker's doctor failed to respond, Benteler issued a letter directly to Parker in a final attempt to confirm her ability to safely perform the essential functions of her job and inquiring whether any limitation or accommodation was needed. [Id.]

Parker concedes that following her receipt of Benteler's final letter, she did not visit her

doctor or any other doctor to obtain the requested information, she did not follow up with Benteler's human resources department, neither she nor any doctor on her behalf sent any questions or request for information to Benteler, and she had no further contact with anyone from Benteler. [Doc. No. 49-3, p. 36].

An employer may inquire into the ability of an employee to perform job-related functions, and "[a]n employer may require an employee to provide documentation ... sufficient to substantiate the limitation that allegedly requires an accommodation." *Delaval v. PTech Drilling Tubulars, L.L.C*, 824 F.3d at 482. Where an employee refuses to provide such documentation, he or she "causes a breakdown in the interactive process that may preclude an employer's liability." *Id*. citing *Griffin v. United Parcel Serv., Inc*., 661 F.3d at 225.

Here, Parker refused to provide the requested information.

In her opposition, without citing any admissible summary judgment evidence, Parker simply argues that "Benteler had a duty to work with [her] toward a reasonable accommodation and the company failed to do so." [Doc. No. 61, Page 14]. Benteler, on the other hand, has produced evidence to show that the breakdown in the interactive process was traceable to Parker. Thus, Parker has not carried her burden of demonstrating that Benteler failed to implement a reasonable accommodation

For the above reasons, the Court finds that Benteler should be granted summary judgment dismissing Parker's failure to accommodate claim with prejudice.                ).

### D.    Retaliation

Benteler contends that Parker's retaliation claim should be dismissed because her poor performance evaluations were not adverse employment actions and because she was terminated for legitimate, non-retaliatory reasons.

To establish a *prima facie* case of retaliation under the ADA, Parker must show that (1) she participated in an activity protected under the statute; (2) Benteler took an adverse employment action against her; and (3) a causal connection exists between the protected activity and the adverse action. *Feist v. Louisiana, Dept. of Justice, Office the Atty. Gen*., 730 F.3d at 454. If Parker is able to establish a *prima facie* case, the burden shifts to Benteler to state a legitimate, non-retaliatory reason for its actions. After Benteler states its reason, the burden shifts back to Parker to demonstrate that Benteler's reason is actually a pretext for retaliation. This can only be accomplished "by showing that the adverse action would not have occurred 'but for' the employer's retaliatory motive." *Id*. In order to avoid summary judgment, Parker must show "a conflict in substantial evidence" on the question of whether Benteler would not have taken the action "but for" the protected activity. *Id*.

In her opposition, Parker argues that there is a causal connection between her complaint of harassment against Greg Black and Troy Lambright, the filing of her EEOC complaint, the employee disciplinary report, and the adverse performance evaluations that led to her ultimate termination. She contends that her low performance evaluations can be directly traced to her team member's failure to properly train her to perform her tasks after she complained about his harassment and failure to train, and to Lambright's eagerness to have her terminated.

An "adverse employment action" must be one that a reasonable employee would consider "materially adverse" in that it "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Stone v. Louisiana Department of Revenue*, No. 12-3022, 2016 WL 3746199, *7 (E.D. La. 7/13/16) citing *Burlington N & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68 (2006). The Fifth Circuit Court of Appeal has made it clear that "written warnings and unfavorable performance reviews are not adverse employment actions where colorable grounds

exist for disciplinary action or where the employee continues to engage in protected activity." *Jackson v. Honeywell Intern., Inc.*, 601 Fed. App'x. 280, 286 (5thCir. 2015) citing *Burlington N & Santa Fe Ry. Co. v. White*, 548 U.S. at 68.

Here, Parker's performance evaluation, which occurred in September of 2015, preceded her EEOC charges. She filed her first charge (Charge No. 846-2015-40693) on October 26, 2015, approximately one month after her evaluation. [Doc. No. 1-2, p. 17]. She thereafter filed two additional charges, which does not indicate she was "dissuaded" by her performance evaluation.

To the extent that Parker seeks to base her retaliation claim on her termination, Benteler contends that she was terminated for a legitimate, non-retaliatory reason — her inability to perform the essential functions of her job and her refusal to provide documentation regarding her ability to work. As detailed above, in December of 2015, Parker reported an inability to perform essential functions of her job — operation of the bar saw or the overhead crane — because of "dizziness." Benteler appropriately exercised its right to seek confirmation as to whether Parker could perform the essential functions of her job and if so, under what conditions.

Benteler made multiple attempts over an almost four-month period to obtain the requested information. Parker simply refused to cooperate. As a result, Benteler had no choice but to terminate her employment. Plaintiff's inability to perform the essential functions of her job constitutes a legitimate, non-retaliatory basis for Benteler's actions. *Sherrod v. American Airlines, Inc.*, 132 F.3d 1112,1123 (5th Cir. 1998) (Employer "refuted any hint of retaliation" by producing evidence that employee was unable to perform duties of position and declined interviews); *McIntyre v. San Antonio Water System*, No. 16-399, 2017 WL 1532608, *9 (W.D. Tex. 4/26/17) (Employee's inability to perform the essential functions of his position and exhaustion of all available leave were legitimate, non-retaliatory reasons for termination).

Benteler's actions in attempting to confirm Parker's ability to perform her job without jeopardizing her safety, the safety of her co-workers or Benteler's equipment were also legitimate and non-retaliatory actions. The Fifth Circuit Court of Appeal has recognized that an employer's desire to confirm an employee's ability to perform his or her job through an authorized medical inquiry is a legitimate, non-retaliatory reason to refuse an employee's return to work. For example, in *Fuentes v. Postmaster General of U.S. Postal Service,* 282 Fed.App'x.296 (5th Cir. 2008), the plaintiff asserted a retaliation claim after her employer refused her return to work pending the results of a fitness-for-duty exam. *Id.* at 303-04. The Fifth Circuit Court of Appeal affirmed summary judgment in favor of the employer, noting that the plaintiff could offer no evidence that her employer's actions were merely pretext for retaliation. *Id.* at 304. A similar result was reached in *Franklin v. City of Slidell*, 969 F.Supp.2d 644 (E.D. La. 2013). The employer's decision to relieve the plaintiff of his duties and require a fitness-for-duty examination was recognized as legitimate and non-retaliatory and summary judgment was granted in favor of the employer. *Id.* at 651-53.

Parker's refusal to provide the requested information, her failure to cooperate during the (attempted) fitness-for-duty evaluation, and her failure to respond to Benteler's final two letters, defeat her retaliation claim. Federal courts that have considered similar facts have concluded that a plaintiff who engages in such activity cannot maintain a retaliation claim. *See Sloan v. Repacorp, Inc.,* 310 F.Supp.3d 891, 901-02 (S.D.Ohio 2018) ("A retaliation claim cannot stand where an employee refuses a proper request for a medical exam or medical inquiry under 42 U.S.C. § 12112(d)(4)(A)."). *Sullivan v. River Valley Sch.* Dist., 197 F.3d 804, 814 (6th Cir.1999) (Plaintiff's ADA retaliation claim was "logically incoherent" where plaintiff refused to submit to the mental and physical exams under §12112(d)(A)(4)).

Because Benteler can offer a legitimate, non-retaliatory reason for its actions, it is Parker's burden to "adduce sufficient evidence that the proffered reason is a pretext for retaliation" by demonstrating "that 'but for' the protected activity, the adverse employment action would not have occurred." *Armstrong v. Marathon Petroleum Company, LP*, No. 3:16-00115, 2018 WL 2976732, *8 (S.D. Tex. 5/1/18). While similar to the "causal connection" aspect of the *prima facie* case, "the burden here is more stringent." *Id*. To survive summary judgment, a plaintiff must establish pretext "through evidence demonstrating that discrimination lay at the heart of the employer's decision." *Id*. citing *Price v. Fed. Express Corp*., 283 F.3d 715, 720 (5th Cir. 2002). This is because "anti-discrimination laws do not require an employer to make proper decisions, only non-retaliatory ones." *Id*. citing *LeMaire v. La. Dept. of Tramp. and Dev*., 480 F.3d 383, 391 (5th Cir. 2007).

Parker has presented no competent summary judgment evidence in support of her arguments and instead relies primarily on her own unsubstantiated allegations. More significantly, she has made no attempt to challenge the legitimate, non-retaliatory reasons offered by Benteler for its actions.

Accordingly, summary judgment should be rendered in favor of Benteler dismissing Parker's retaliation claim.

## III.    CONCLUSION

For the reasons set forth above, Benteler's Motion for Summary Judgment [Doc. No. 49] is **GRANTED**.  Parker's claims of sexual harassment, failure to accommodate, and retaliation are **DISMISSED WITH PREJUDICE.**

MONROE, LOUISIANA, this 20th day of June, 2019.

**TERRY A. DOUGHTY**
**UNITED STATES DISTRICT JUDGE**